IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Phillip S. Figa

Civil Action No. 04-cv-00235-PSF-PAC

VIRGINIA L. POWELL,

      Plaintiff,

v.

AETNA LIFE INSURANCE COMPANY (also doing business as
Aetna US Healthcare); and
QUEST DIAGNOSTICS INCORPORATED WELFARE PLAN (also known as
The Quest Diagnostics' Aetna Long-Term Disability Benefit Plan, and also known as
The Quest Diagnostics' Managed Disability Benefits Plan), and
THE QUEST EMPLOYEE BENEFITS ADMINISTRATION COMMITTEE,

      Defendants.

---

## FINAL ORDER ON REVIEW OF ADMINISTRATIVE RECORD

---

      This is a case arising under the Employee Retirement Income Security Act

of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  Plaintiff Virginia Powell claims that

Defendant Aetna Life Insurance Company ("Aetna") acting as the plan administrator

and insurer, Defendant Quest Diagnostics Incorporated Welfare Plan ("Plan") (the plan

itself), and Defendant Quest Employee Benefits Administration Committee (the plan

administrator) violated ERISA when plaintiff's disability benefits were terminated as

of January 22, 2001, and thereafter by failing to provide her with documentation as

required by Section 1132(c) of ERISA.  Plaintiff seeks an order from the Court restoring

disability benefits to her, directing payment of back benefits pursuant to 29 U.S.C.

§ 1132(a)(1)(B) and for the statutory penalty provided for in 29 U.S.C. § 1132(c).

Plaintiff also seeks an award of attorneys' fees and costs.  Defendant urges this Court

to affirm its decision on benefits and to dismiss plaintiff's claims.

**PROCEDURAL BACKGROUND**

Plaintiff filed her complaint in Denver District Court on December 19, 2003.  The

case was timely removed to this Court on February 6, 2004.  The complaint, although

not set forth with separately titled claims for relief, appeared to include state law claims

for breach of contract, breach of the covenant of good faith, and violation of a Colorado

statute prohibiting deceptive practices by insurers, C.R.S. §§ 10-3-1103 and 1104(1).

On March 1, 2004, defendants filed a motion to dismiss the state law claims on the

ground of ERISA preemption, and the claim under Section 1132(c)(1) for failure to

produce documents because plaintiff had failed to name the proper party.

On April 28, 2004, plaintiff filed a motion for leave to file an Amended Complaint,

which was granted on April 30, 2004.  The Amended Complaint added Defendant

Quest Employee Benefits Administration Committee ("Committee") as a party against

whom the claim for failing to timely produce documents could be properly stated.  The

Amended Complaint also contained two numbered claims for relief, one asserting a

claim against Aetna and the Plan for benefits 29 U.S.C. § 1132(a)(1)(B) (First Claim for

Relief), and a second claim against all defendants seeking statutory penalties pursuant

to 29 U.S.C. § 1132(c) for failing to produce timely plan documents (Second Claim for

Relief).

On April 30, 2004, defendants filed a motion for partial summary judgment as to

the standard of review governing ERISA claims.  On May 21, 2004 defendants renewed

their motion to dismiss insofar as it applied to the Amended Complaint.  The Court directed plaintiff to file a response to the motion for partial summary judgment and set the matter for hearing on June 4, 2004.

In open court on June 4, 2004, the Court denied as moot defendants' motion to dismiss the original complaint since the Amended Complaint had been filed.  *See* Transcript of June 4, 2004 hearing at 3.  The Court directed that Defendant Committee be added to the caption.  *Id.* at 61.  The Court also noted that the state law claims, other than the deceptive practices claim, had been eliminated in the Amended Complaint rendering moot that part of defendants' motion.  *Id.* at 4.  The Court also denied defendants' motion to dismiss the Amended Complaint under Rule 12(b)(6), stating that it could not find that plaintiff had failed to state a claim under ERISA, nor could it find that plaintiff had failed to state a claim entitling her to the statutory penalty. *Id.* at 60, 62-63.  The Court reserved ruling on the claim alleging violation of the consumer protection provisions.  *Id.* at 61.  The Court directed defendants to answer the Amended Complaint by June 14, 2004.  *Id.*

On June 4, 2004, the Court also granted, in part, the defendants' motion for partial summary judgment on the standard of review, finding that Aetna had discretion as the plan administrator and therefore its determination on coverage would be reviewed under the "arbitrary and capricious" standard, but subject to limited deference proceeding along a sliding scale as then provided in *Fought v. UNUM Life Insurance Co.*, 357 F.3d 1173 (10th Cir. 2004) (*Fought I*), *vacated and superceded on rehearing by Fought v. UNUM Life Ins. Co. of Am.,* 379 F.3d 997 (10th Cir. 2004) (*Fought II*),

3

*cert. denied,* 125 S.Ct. 1972 (2005), in light of the potential conflict of interest of Aetna. *Id.* at 60.

On June 4, 2004 the Court also determined that discovery in this case and a trial of this matter would not be necessary, but rather the case would be decided on the administrative record. *Id.* at 61-62. Accordingly, the Court ordered the administrative record to be compiled by defendants and filed with the Court no later than August 27, 2004. *Id.* The parties were also directed to file simultaneous briefs supporting their respective positions by August 27, 2004. *Id.*

The defendants timely filed their answer on June 18, 2004. On June 28, 2004, the Court entered an order finding that plaintiff's claims under the Colorado deceptive practices statute, C.R.S. § 10-3-1104(1), were preempted by ERISA effectively dismissing that claim. On July 12, 2004, plaintiff moved the Court to reconsider its Order, arguing that the Court had failed to consider the decision in *Kentucky Asso. of Health Plans v. Miller*, 538 U.S. 329 (2003). On July 14, 2004, the Court denied the motion to reconsider stating again that ERISA preempts plaintiff's claim under C.R.S. § 10-3-1104(1).

On August 20, 2004, defendants moved for leave to file an amended answer to the Amended Complaint, seeking to add a defense of statute of limitations with respect to the claims for penalties under 29 U.S.C. § 1132(c), arguing that such claim is barred by the one-year statute of limitations applying to penalties, C.R.S. § 13-80-103(d), and to amend the previously established scheduling order (Dkt. # 42). Plaintiff filed her opposition to the motion on September 9, 2004. By Order entered on October 6, 2004

4

the Court allowed defendants' motion to amend the answer and denied the request to change the briefing schedule.

In the Order of October 6, 2004, the Court also entered an Order on plaintiff's pending motions which should be restated here in order to clarify the status of the administrative record.  As set forth above, the Court had ordered filing of the administrative record and simultaneous briefing no later than August 27, 2004. Defendants complied with that Order, filing a motion for summary judgment and supporting brief ("Defendant's Motion"), a Statement of Undisputed Material Facts ("Defendants' Statement of Facts") and submitting an administrative record, described as Exhibit A to the Defendant's Motion, consisting of 1,465 pages bates-stamped AR 000001-001465.   Plaintiff did not file her final brief, but rather filed a "Motion to Clarify Schedule and Address Submission of Administrative Record" (Dkt. # 47) and a motion seeking additional time through October 12, 2004 to file her response to defendants' Motion for Summary Judgment. (Dkt # 51).

In the Order entered on October 6, 2004, this Court noted that plaintiff apparently was requesting leave to file additional documents for inclusion in the administrative record, or to file an "index" to the record created by plaintiff's counsel. The Court also noted that in an effort to achieve this result, plaintiff had filed her own version of an administrative record on September 17, 2004, which consisted of at least 1,499 pages and was paginated differently than the record previously submitted by defendants.  Accordingly, in the Order of October 6, 2004 the Court struck plaintiff's version of the administrative record, allowed plaintiff to file a separate, proposed

5

supplement to the administrative record if she wished to add more documents, allowed

the "index" to be file as part of plaintiff's response in opposition to defendant's Motion

for Summary Judgment, and reiterated its prior order granting plaintiff through October

12, 2004 to file such response.

On October 12, 2004 plaintiff filed her response in opposition to the defendants'

Motion for Summary Judgment, along with her statement of facts containing the "index"

referred to above.  On the same day, plaintiff also filed a Motion for Additional Time to

Re-Cite the Administrative Record (Dkt. # 61).  The essence of plaintiff's motion was

that she had already prepared her brief and statement of facts with citations to the

version of the administrative record filed by her on September 17, 2004, which the

Court had struck.  The Court allowed plaintiff until November 1, 2004 to re-file her brief

and statement of facts.

On October 29, 2004, plaintiff filed her Revised Brief and Revised Statement

of Facts ("Plaintiff's Revised Statement of Facts").  On the same day she also filed a

motion to supplement the administrative record to add pages Supp. AR 1466-1533

(Dkt. # 64).  By Order entered on November 2, 2004, the Court granted plaintiff's

motion to supplement the record.

Thus, the administrative record before the Court for purposes of this case is the

exhibit submitted by defendants on August 29, 2004, consisting of pages AR 000001-

001465 contained in three loose leaf binders, and the additional pages identified

by plaintiff in her motion of October 29, 2004, which she bates-stamped as Supp.

AR 1466-1533, which are contained in a separate binder.  The Court will refer to the administrative record by these page numbers.

Defendants filed a reply brief in support of their Motion for Summary Judgment on November 24, 2004.  For reasons not entirely clear to the Court, plaintiff also filed a "Motion for Judgment" on November 17, 2004 (Dkt. # 68), which appears to incorporate her prior arguments.  On December 9, 2004 , plaintiff filed a "Reply Brief" in support of her motion for judgment, which appears to be a response to the reply brief filed by defendants on November 24, 2004.  Plaintiff filed additional authority is support of her position on March 17, 2005 and on August 3, 2005, and defendants filed a response to the supplemental authority on August 9, 2005.

To say the least, this matter is thus fully briefed and ripe for decision on plaintiff's claims.

**FACTUAL BACKGROUND**

Plaintiff, Virginia Powell, was an employee of Quest Diagnostics, Inc., working as a nurse, phlebotomist and systems manager from February 24, 1988 through July 24, 1998.  It appears from medical notes in the Administrative Records that on or about July 24, 1998 plaintiff was hospitalized at the North Colorado Medical Center in Greeley, Colorado as a result of a recurrence of major depression and report of a suicide plan (AR 624).  Plaintiff was discharged on July 31, 1998 (AR 625), but apparently did not return to work.  By letter dated July 29, 1998, her employer advised her that the situation would be treated as one eligible for leave under the Family and Medical Leave Act, and that she would be eligible for 12 weeks of leave (AR 1099-

7

1102).  The letter also advised plaintiff that she may be eligible for disability benefits and advised her she should apply to Aetna for such benefits as soon as possible (*id.* at 1099).

Although the Court has not been able to locate plaintiff's application, the parties agree that plaintiff was placed on short-term disability effective July 24, 1998 (Defendants' Statement of Facts, ¶¶ 20, 21; Plaintiff's Revised Statement of Facts, ¶ P-10).  It appears that plaintiff submitted a psychiatric assessment from Dr. James Medelman dated August 6, 1998 and a similar assessment from Dr. Jeffrey Huff dated September 1, 1998 in support of her request for short-term disability (AR 627, 628).

The Court has located no document in the Administrative Record that reflects exactly when plaintiff was notified that her request for short-term disability was approved or exactly what disability provided the basis for such benefits.  However, by letter dated March 3, 1999, Aetna advised plaintiff that its records reflected that her certified period of disability commenced on July 24, 1998 and exceeded 26 weeks on January 22, 1999, at which time she became eligible to receive monthly managed disability benefits through Aetna (AR 631).  These benefits are referred to by the parties as long-term disability benefits, or "LTD."  (Plaintiff's Revised Statement of Facts, ¶ P-10; Defendants' Statement of Facts, ¶ 21).  The letter further sets forth the computation of her benefits and the "Criteria for Continuation of Benefits," stating as follows: "Based upon the Managed Disability plan provisions, your maximum period of entitlement will expire at age 65. . . .  If your disability is the result of a mental condition, benefits under this plan are limited to 24 months from the date your disability

8

commenced, unless you are confined in a health facility at the expiration of that period."

(AR 632).  There is no dispute that plaintiff did not return to work at Quest and that the

benefits were paid through January 22, 2001 (Plaintiff's Revised Statement of Facts,

¶¶ P-8 and P-10; Defendants' Statement of Facts, ¶ 21).

There is no dispute that the 1998 Quest employee benefits handbook, hereafter

referred to as the plan[1], contained this so-called "mental health limitation" of two-years

for disability payments resulting from a mental condition (Plaintiff's Revised Statement

of Facts, ¶ P-16; Defendants' Statement of Facts, ¶ 10).  The specific language of the

plan as of 1998 provided:

> *Mental Illness Coverage*
>
> Long-term disabilities caused *to any extent* by a mental
> condition (including those related to alcoholism or
> substance abuse) will be limited to 24 months of long-term
> disability benefits.  If you are confined in a hospital or
> treatment center at the end of the 24-month period, benefits
> may continue for an additional period of time.

AR 55 (italics in original).

Plaintiff applied for Social Security disability benefits and by letter dated

November 27, 1999 she was awarded benefits for a period commencing March 1999

(AR 644-46).  By letter dated December 23, 1999, plaintiff forwarded the social security

notice to Aetna, along with two notes from her doctors that she submitted because she

hoped that would result in an extension of her disability benefits that plaintiff apparently

---

[1] In their briefs the parties refer to the handbook as a Summary Plan Description, or
SPD.  *See* Defendants' Statement of Facts at ¶ 1; Plaintiff's Revised Statement of Facts at
¶ P-17.

thought were due to expire in December 1999 (AR 643).  The note from Dr. Janis

McCall, dated November 11, 1999, states:  "The above pt. [patient] is totally disabled

d/t [due to] emotional fragility, chronic depression & total knee replacement 9-27-99.

Will be disabled for min. of 6 mo."  (AR 647.)  Notwithstanding what plaintiff may have

believed about the expiration of benefits, there is no dispute that her long-term benefits

continued until January 22, 2001 (Plaintiff's Revised Statement of Facts, ¶¶  P-8 and

P-10; Defendants' Statement of Facts, ¶ 21).

By letter dated November 28, 2000, Dr. McCall provided another medical

assessment to Aetna, in which she stated that plaintiff "has had multiple, chronic,

disabling medical problems as well as a significant depression resistant to any medical

treatment."  (AR 661.)  The letter details plaintiff's medical problems as well as some of

the drugs she has been taking.  The letter further states that "[d]espite consultation and

treatment by multiple specialists (pulmonology, neurology, gastroenterology, and

psychiatry) patient has, medically, become more and more ill with her diabetes,

peripheral neuropathy, chronic joint pain and chronic bronchitis."  *Id.*  The letter

concludes:   "Although I do not do disability determinations.  In my opinion, she is

totally disabled secondary to her medical conditions, and is unlikely to improve.  None

of our medication or treatment has significantly improved any of her symptoms or

immobility."  *Id.*  The record does not reflect any reason why Dr. McCall provided this

letter.

By letter dated December 21, 2000, Aetna again advised plaintiff that when

a disability is "the result of a mental/nervous condition as defined by the policy" the

benefits "terminate after twenty four monthly benefits are payable if not hospital confined with 30/90 day continuation." (AR 662). The letter also states: "According to the latest medical information we have, you are not hospital confined; therefore, we are terminating your claim effective January 22, 2001." *Id.*

The letter also advised plaintiff that Aetna will review any additional information she wishes to submit, such as medical information from treating physicians, and that she was entitled to a review of the benefit determination (AR 662-63). The record also reflects that on December 21, 2000, Aetna faxed a request for medical records to Dr. McCall (AR 665-66). Dr. McCall apparently provided a substantial volume of medical records, which are contained in the administrative record at AR 670-726.

By letter to plaintiff dated January 22, 2001, Aetna confirmed the information provided to plaintiff in its letter of December 21, 2000 regarding the application of the mental health limitation, notified her that her claim was terminated effective January 23, 2001, reiterated her entitlement to a review of the benefit determination, and advised that she could submit additional medical information (AR 727-28). An internal Aetna file review memorandum, prepared by analyst Barbara Richey, indicates that she listed plaintiff's conditions as including gastro esophageal reflux disorder ("gerd"), secondary hepatitis, sleep apnea, a problem with her knees, DMII, diabetic neuropathy, major depressive disorder with recurrent episodes that are severe but without psychotic behavior (AR 729-30). The memorandum also indicates that some of the limitations on plaintiff's ability to work are poor concentration, depressed mood, difficulty sleeping,

anhedonia[2], sadness, fatigue, fearful, easily distracted, overwhelmed, passive suicidal thoughts.  *Id.*

Despite its January 23, 2001 notification to plaintiff and the contemporaneous termination of her benefits, Aetna did not terminate its review of plaintiff's case at that time.  On or about January 26, 2001, Dr. Bonner, Aetna's medical director, reviewed plaintiff's file and entered the following observations regarding plaintiff's case:

> She has along [sic] history of depression that has been
> refractory to treatment.  At the end of her mental nervous
> benefit, she now presents information regarding concurrent
> illness and how these other diagnoses further disable her.
> The clinical information does show a fairly heavy burden of
> illness but it is unclear from the records presented that she
> is disabled on a non-mental/nervous basis.  Dr. McCall
> provides an ongoing dialog regarding her multiple
> diagnoses.  From my reading of the records, it appears
> that Ms. Powell's depression has a significant impact on all
> of her other diagnoses. Since her depression is not under
> control, she is not able to alter her tobacco use, manage
> her diet or take medications appropriately.  The depression
> clearly overshadows and impacts her entire health picture.
> Functional status is unknown.

AR 476.  Dr. Bonner recommended a functional capacity evaluation ("FCE") for plaintiff.

*Id.*

By letter dated February 6, 2001, plaintiff was referred by Aetna to Health South for a two-day FCE to be performed at an independent clinic (AR 734).  The FCE was completed on March 5-6, 2001 (AR 741-48).  The evaluation indicates that plaintiff was

---

[2]  Anhedonia is defined in the Online Medical Dictionary as "absence of pleasure from the performance of acts that would ordinarily be pleasurable." http://cancerweb.ncl.ac.uk/cgi-bin/omd? query=anhedonia&action=Search+OMD

functioning in a sedentary work classification due to her inability to complete the test and her decreased aerobic condition. Although she was able to lift weight equivalent to a "light" work category, the report states she could not tolerate such lifting for an extended period of time (AR 742).  The report concludes that plaintiff "may be suited for sedentary work with limited repetitive use of the hands."  *Id.*

On March 19, 2001, Dr. Bonner again reviewed plaintiff's file, along with the FCE that had been performed.  He reiterated much of what he stated in his January 26, 2001 report, but based on the FCE he noted that plaintiff "is found to be capable of performing sedentary PDC [physical demand classification] work." (AR 478).  He opined that "[a]bsent her chronic depression, Ms. Powell would surely have performed better."  *Id.*  He made the recommendation that plaintiff is "capable of returning to a sedentary PDC occupaiotn [sic].  Her chronic depression appears to be the primary barrier to a RTW [return to work]."  He concluded that referral to for a TSa [transferrable skills assessment] and LMS [labor market survey] would be reasonable. *Id.*

An internal Aetna memorandum (AR 754-56) reflects that a transferable skills analysis was prepared based on plaintiff's work history and her FCE.  Several potential occupations were identified, including two that were apparently felt to be potentially appropriate for plaintiff's skills–cytotechnologist and "customer services representative, insurance." (AR 755).  According to the Aetna memorandum, these occupations appeared to be within plaintiff's functional capacity as set forth on the FCE.  *Id.*

13

Aetna thereafter referred plaintiff's case to a vocational rehabilitation specialist, Mr. Doug Nutting, who performed a labor market survey as of May 1, 2001 (AR 763-67).  The survey identified 11 open and available positions in the Greeley area which he believed plaintiff could perform (*id.* at 767).

By letter dated May 15, 2001, Aetna again informed plaintiff that her claim was terminated effective January 22, 2001, reiterating what it had stated in its two previous letters to her (AR 775-76).  While defendants state that "[o]n May 15, 2001, on the basis of all of the aforementioned evidence, Aetna determined that Ms. Powell did not meet the definition of disability under the terms of the Plan" (Defendants' Statement of Facts, ¶ 31), the Court finds no such language in this May 15, 2001 notification letter. However, the letter does expressly advise plaintiff that she had a right to a review of the benefit determination (AR 775).

Plaintiff apparently understood that her request for disability benefits had been denied, as she retained counsel to represent her and file with Aetna for continuing review of her claim for benefits.  By letter dated June 17, 2001, counsel filed with Aetna a request for continuing review and an appeal of the benefits decision, as well as a request for information.  *See* AR 777-81.

By letter dated July 17, 2001, Aetna acknowledged receipt of counsel's request for a review and appeal of the benefits determination, and advised that it would provide a written response within 60 days, or within an extended period if circumstances required.  The latter also advised counsel that Aetna was in the process of obtaining the documents to which plaintiff was entitled, and advised counsel that copies of the

summary plan description and insurance policies could be obtained from the plan administrator (AR 799).

By letter dated August 9, 2001, Aetna transmitted some documents to plaintiff's counsel in response to his request, but the letter does not identify which documents were sent.  The letter again reiterates Aetna's willingness to review "any new, relevant information pertaining to" plaintiff's disability claim (AR 806).

Plaintiff's counsel submitted a lengthy, detailed response to Aetna's prior letter in a letter dated September 20, 2001 (AR 807-15).  In addition to requesting documents which counsel felt had been omitted, he provided Aetna with his view of why its prior decision on plaintiff's disability claim was in error, and identified specific medical problems of plaintiff which he requested Aetna to consider.  These included his view that the FCE performed by Health South did not adequately consider plaintiff's impairments due to chronic pain, neuropathy, cognitive impairment due to pain and medicines, lack of focus, stamina, energy concentration, and other skills needed for employability, and difficulties secondary to other medical problems especially chronic pain, such as depression (AR 808).  Plaintiff's counsel also addressed medical records he had forwarded, primarily from Drs. McCall and Huff, and stated that plaintiff's "chief complaints" were "diabetes, hypertension, peripheral neuropathy, chronic pain syndrome and chronic depression."  (AR 810-11.)  He further argues that the notes of Dr. Huff, plaintiff's psychiatrist, indicate plaintiff's depression is "secondary to multiple medical problems."  (AR 812) (emphasis in original).  Counsel also argued that the

mental health limitation as it appeared in the 1998 policy should not be applied to

Ms. Powell's claim as it was eliminated from the plan in 1999 (AR 813-14).

It appears that on October 12, 2001, Aetna referred plaintiff's file for further

review by Dr. Oyebodo Taiwo, an internal medical examiner at Aetna. *See* AR 818-20;

Defendants' Statement of Facts, ¶ 33.  The request form asks the reviewer to determine

whether the insured is disabled in her "own occ[upation]." (AR 820).  By letter of the

same date, Aetna advised plaintiff's counsel that the review would exceed the 60-day

period and that Aetna was extending the review up to November 10, 2001 (AR 823).

Dr. Taiwo's review is presented in a memorandum dated November 7, 2001

(AR 818-19), in which he summarized the medical records from Drs. McCall and Huff

which he reviewed.  It appears that all the records were from dates after plaintiff's

original period of disability began on July 24, 1998.  Dr. Taiwo concludes that "[i]n

terms of her functional ability," he believes plaintiff "should be physically capable of

sedentary work that involves sitting most of the time, but may include walking or

standing for brief periods.  She would require a setting that allows her to alter her

position frequently and would be restricted from repetitive and continuous activity

involving the use of her hands."  (AR 819).

Dr. Taiwo's memorandum also states that plaintiff's job as "operator manager"

was described as "computer data entry and walking.  It was classified as requiring light

physical demand." (AR 819).  *See also* the insert on the request form adjacent to "job

title" which reads: "Operation Manager (light check)." (AR 818).  Apparently having

understood plaintiff's job to be classified as "light work," Dr. Taiwo's memorandum then opines: "For these reasons, I do not believe that she is physically capable of performing her own occupation." (AR 819).[3]

By letter dated February 6, 2002 (AR 825-26), Aetna notified plaintiff's counsel of its decision "upholding our termination of Ms. Powell's" benefits (AR 825).  The letter is hardly a model of clarity with respect to setting forth the reasons for the termination of benefits.

At one point, the letter states that according to the plan, a person is considered disabled if "during the first 30 months of a certified period of disability you are not able, solely because of disease or injury, to perform the material duties of your own occupation; except that if you start work at a reasonable occupation." (AR 825).  This appears to be a determination that plaintiff's disability claim was denied because Aetna determined that she was able to perform the material duties of her own occupation.

Yet the letter goes on to state that plaintiff became disabled on July 24, 1998, that she was then employed as an operator manager at the time she ceased active

---

[3]   In a December 4, 2002 letter responding to plaintiff's counsel, Aetna states that Dr. Taiwo's categorization of plaintiff's occupation as "light" work "was based upon his misunderstanding."  *See* AR 882.  The letter further states that the computer records provided indicate a "12/01 notation from Lori Lundberg responding to a request by Dr. Taiwo to clarify the categorization of" plaintiff's occupation.  *Id.*  The Court notes a computer record dated December 21, 2001 that appears to be what is referenced (AR 328).

However, the Court notes that the October 12, 2001 form request for review contains a handwritten notation stating "clmt's occupation should be classified as <u>sedentary.</u>" (AR 820).  There is no indication when this notation was placed on the request for review.  Moreover, an internal Aetna document describing plaintiff's "computer data entry position" classifies the job as "light." (AR 821).  The internal document bears a handwritten note that reads "PDL -light or sedentary?" reflecting confusion apparently even on the part of Aetna.

work, and the occupation is classified as "sedentary physical demand work capacity."

Assuming all this, Aetna apparently found plaintiff was **not** able to perform sedentary

work as of July 24, 1998.  Although the letter does not so state, the Court infers this

determination was due to plaintiff's "major depressive disorder."  *Id.*

What is not made clear in the February 6, 2002 letter is why Aetna states

elsewhere in the letter that plaintiff is capable of sedentary work as of February 2002.

It appears that what Aetna means to say is that while plaintiff's depressive disorder

rendered her disabled in July 1998, there is no other physical disorder that renders her

disabled as of the date of determination in February 2002.  And, since the plan had a

mental health limitation of two years of benefits, plaintiff's benefits are terminated.

The letter concludes that "[t]his is the final decision" regarding the plaintiff's claim

(AR 826).  Were this the final decision of Aetna, given its inconsistent and muddled

explanation, the Court might find that the letter failed to meet the ERISA requirement

that a denial of benefits set forth specific reasons.  *See* 29 U.S.C. § 1133(1).

However, notwithstanding the statement in the letter, the administrative record

reveals plaintiff continued to submit medical information from her doctors, and Aetna

continued to review such information.  *See* AR 830-56.  By letter dated July 18, 2002,

plaintiff's counsel again argued that the mental health limitation had been deleted in

1999 and should not be applied to deny plaintiff's request for benefits (AR 1428-31).

By letter dated September 23, 2002, Aetna advised plaintiff's counsel that "[w]e are

reviewing our position with regard to your contention that the deletion of the

mental/nervous limitation was favorable to Ms. Powell." (AR 857).  As Yogi Berra

once said, presumably in a non-ERISA context, "it ain't over 'til it's over."

During the fall of 2002, plaintiff's counsel sent additional letters to Aetna arguing

plaintiff's position regarding the change in coverage as well as her position that the

decision on her disability claim was erroneous from a medical standpoint.  *See* AR 859-

67 and AR 874-77.  By letter dated December 4, 2002 (AR 878-84), Aetna advised

plaintiff that it had made a "final determination" and reaffirmed its earlier decision to

terminate her benefits (AR 884).  In that letter, Aetna summarizes its prior notifications

to plaintiff, describing the February 6, 2002 determination as a finding that plaintiff's

"disability was her depression and, therefore, subject to the contracts mental/nervous

limitation." (AR 879).

The December letter also responds in a detailed manner to two issues raised

by plaintiff's lawyer.  Aetna first sets forth its position as to why the mental/nervous

limitation applies to plaintiff's claim for benefits (AR 879-80).  Essentially, the letter

concludes that the deletion of the mental limitation became effective January 1, 2000,[4]

and did not apply to plaintiff as she "never actively returned to work" after that date

(AR 880).  Second, it addresses plaintiff's argument that even if the limitations

provision is applicable, plaintiff is entitled to benefits because her disability is a

physical rather than a behavioral issue (AR 879-83).  The letter points out that the plan

---

[4]   It appears that the December 2, 2002 letter is in error as to the effective date of
the elimination of the mental health limitation.  Defendants state in their statement of facts:
"Effective January 1, 1999, while Ms. Powell was on disability leave and receiving short-term
disability benefits, the Plan was amended, and new Plan terms took effect.  The 1999 Plan
did not include the Mental Illness Limitation."  Defendants' Statement of Facts, ¶ 11.

provides that after "the first 24 months of a certified period of disability," the benefits continue only if the insured is not able "to work at any reasonable occupation." (AR 881) (emphasis omitted).

Aetna further states in this letter that a further medical review had been performed by a Dr. Walter DeFoy (AR 881). The letter does not state when Dr. DeFoy performed his review, although it apparently occurred some time in the Fall of 2002. The letter describes Dr. DeFoy as "an Aetna medical director specializing in behavioral disorders." (AR 881). Aetna asserts that he performed a "full *de novo* review" of plaintiff's claim. Defendants' Statement of Facts, ¶ 35. It is apparent that Dr. DeFoy did not perform a physical examination of plaintiff, but rather reviewed her records. The administrative record does not appear to contain any written notes or memorandum by Dr. DeFoy. The letter of December 4, 2002, however, summarizes his findings (AR 881-82). Essentially, his findings echo what Dr. Bonner found in his review in March 2001, emphasizing that plaintiff's disability was "directly attributable to her depression." *Id.* at 881. Therefore, the letter states "we remain convinced that the decision to attribute her disability to depression, and to terminate those benefits based upon the Limitation, was correct." (AR 883).

The letter also summarizes the review and testing of plaintiff performed in 2001, and states that it was determined that plaintiff "retained a capacity to perform sedentary work." (AR 882). Because the test of disability "is whether an individual is unable to work at any reasonable occupation," Aetna concluded that plaintiff's "medical condition does not meet the test of disability." *Id.* The letter concludes stating "we must reaffirm

our earlier decision to terminate Managed Disability benefits effective January 23, 2001. This is Aetna's final determination in this matter." (AR 884).

By letter dated January 3, 2003 (AR 1457-60), plaintiff's counsel acknowledged receipt of the December 4, 2002 final determination and stated that plaintiff "is now compelled to commence litigation." (AR 1457). The administrative record does not reflect any response by Aetna to this letter. As previously noted, plaintiff's initial complaint was filed December 19, 2003.

**THE PARTIES' CONTENTIONS**

Defendants contend that the decision to terminate plaintiff's benefits as of January 23, 2001 pursuant to the mental health limitation was not arbitrary and capricious, whereas plaintiff contends that the mental health limitation did not apply to plaintiff at the time her benefits were terminated.

Plaintiff contends that even if the mental health limitation did apply to her, she was wrongfully denied benefits. Defendants respond that plaintiff was not otherwise disabled "absent her depression" for which she had already received 24 months of benefits, and therefore the determination not to allow further disability benefits was not arbitrary and capricious. Plaintiff, however, asserts that the decision was arbitrary and capricious as her medical conditions other than her depression constituted a disability entitling her to benefits.

Defendants submit that plaintiff's penalty claim should be dismissed because it is time-barred, because it is not properly brought against Defendants Aetna and Quest, and because the only proper defendant, the Administration Committee, properly

21

responded to plaintiff's request for information.  Plaintiff disagrees with each of these contentions.

Finally, defendants argue that the arbitrary and capricious standard of review applies in this case, and that any conflict of interest on the part of Aetna does not reach a level of severity under *Fought II, supra*, so as to warrant a "second tier" of reduced deference, whereas plaintiff retorts that Aetna's conflict of interest and "procedural irregularities" warrant decreased deference along the "sliding scale."

## STANDARD OF REVIEW

There is no dispute in this case that Defendant Aetna, functioning as the claims administrator under an Administrative Services Contract ("ASC"), was provided with discretion under the plan to determine eligibility for benefits and construe the terms of the plan. (Plaintiff's Revised Statement of Facts, ¶¶ P-3 and P-4; Defendants' Statement of Facts, ¶ 3; AR 90, 181).  Therefore, this Court must apply the so-called "arbitrary and capricious" standard of review.  *Fought* II*, supra*, 379 F.3d at 1003.

There is also no dispute here that the plan is self-insured for the first five years of an insured's benefits and insured by Aetna thereafter (AR 90).  Plaintiff contends that Aetna's role as insurer after five years creates a conflict of interest in that it is both the claims administrator and the insurer.[5]  In such a situation, plaintiff argues that the

_____

[5]   Plaintiff also argues that Aetna charges fees to the plan "determined by the level of processing and the payment of claims."  Plaintiff's Revised Brief at 6.  Plaintiff argues that denials of claims "will enhance fees for Aetna," citing to no sources.  *Id.*  The Court finds that the record does not support this suggestion.  The Court notes that the ASC provides that "the charges for administration of the Plan . . . will take into account . . . [t]he amounts of disability benefits paid and the number of processed claims transactions for the various kinds of benefits . . . . " (AR 179).  This section of the contract goes on to set forth a schedule of the fees paid

less deferential standard applies.  Plaintiff also argues that this case presents a

"procedural irregularity" that requires a further reduction of deference.  However, the

Court finds that the procedural irregularities asserted by plaintiff (*see* Plaintiff's Revised

Brief at 6-7) are not supported by the record, and do not rise to the level of procedural

deficiencies warranting lesser deference.

> As articulated in *Fought II*:

>> Under this less deferential standard, the plan administrator
>> bears the burden of proving the reasonableness of its
>> decision pursuant to this court's traditional arbitrary and
>> capricious standard.  *See* Kennedy, *Judicial Standard,*
>> 50 AM. U.L.REV. at 1174.  In such instances, the plan
>> administrator must demonstrate that its interpretation of the
>> terms of the plan is reasonable and that its application of
>> those terms to the claimant is supported by substantial
>> evidence.  The district court must take a hard look at the
>> evidence and arguments presented to the plan administrator
>> to ensure that the decision was a reasoned application of
>> the terms of the plan to the particular case, untainted by the
>> conflict of interest.

379 F.3d at 1006.

Aetna argues that there is no conflict of interest and thus the less deferential

standard should not apply here because plaintiff's claim for continuing benefits beyond

the two-year period that ended in January 2001 would not have triggered any liability

on the part of Aetna for at least another three years.  Citing to *Pitman v. Blue Cross &*

*Blue Shield of Oklahoma,* 217 F.3d 1291, 1296 (10th Cir. 2000), Aetna argues at 10 of

---

to Aetna.  It appears that Aetna is paid higher fees per case if it is called upon to administer
managed disability benefits and provide disability certification and claims administration.  *See*
Section 5 of ASC, schedule of fees, at AR 179.  Thus, it does not appear that denying
disability claims increases Aetna's fees.

its Motion For Partial Summary Judgment, that it like the insurer there, "incurs no direct, immediate expense as a result of benefit determinations favorable to plan participants." Aetna contends that many events could occur in the five years of benefits funded by Quest before Aetna would be called upon to pay benefits, so that any expense is not direct or immediate as described in *Pitman. Id.*

At the hearing on June 4, 2004, the Court stated that it believed a conflict of interest is "somewhat applicable here that requires some proceeding on the sliding scale" of *Fought.* The Court stated that it would determine at a later time "precisely how much deference will be given." Transcript at 60. The Court referenced the decision in *Woo v. Deluxe Corp.,* 144 F.3d 1157 (8th Cir. 1998), a case in which the claims administrator, Hartford, argued that it had no conflict because its obligation as insurer did not commence until the disability extended beyond two years. The Eighth Circuit rejected the argument, stating "[w]hen Hartford, as plan administrator, denies benefits, it will receive a direct financial benefit as plan insurer if the disability extends beyond two years." 144 F.3d at 1161.

In the instant case, Aetna too would receive a financial benefit by denying plaintiff's claim and insulating itself from a liability should the claim last for more than five years. While the degree of conflict is not as direct as when the claims administrator is the insurer from the outset of the disability, there is unquestionably some degree of self-interest or conflict of interest. The Court also notes that Aetna expressly agreed to act as a fiduciary for benefit determination and review of denied claims for benefits under ERISA (AR 181). Therefore, it is held to a higher standard.

24

Accordingly, the appropriate standard of review to be applied to the Aetna's determination here is the "arbitrary and capricious" standard of review, as articulated in *Fought II, supra*, but with some reduced deference as described therein due to Aetna's conflict of interest.  As stated in *Fought* II, this is a case where "the district court is required to slide along the [arbitrary and capricious] scale considerably and an additional reduction in deference is appropriate."  379 F.3d at 1007.  The burden is thus shifted "to the fiduciary to justify the reasonableness of its decision."  *Id.* at 1006.

**THE SLIDING SCALE ANALYSIS**

1.    <u>Whether the application of the mental health limitation was reasonable</u>.

The Court first considers plaintiff's arguments that the Aetna's application of the mental health limitation so as to terminate plaintiff's benefits in January 2001 was not reasonable.

As noted above, there is no dispute that the language limiting to two years the period for receipt of benefits for a disability related to mental health appeared in the plan documents in 1998, which was the year plaintiff first applied for disability benefits (Plaintiff's Revised Statement of Facts, ¶ P-16; Defendants' Statement of Facts, ¶ 10). It is also not disputed that effective January 1999 the plan was amended to delete this mental health limitation (Plaintiff's Revised Statement of Facts, ¶ P-16; Defendants' Statement of Facts, ¶ 11; compare also 1998 plan at AR 55, stating the mental health limitation, with the 1999 plan at AR 141, omitting the mental health limitation; and *see also* AR 231).  The dispute is whether the limitation was reasonably applied by Aetna in January 2001 to terminate plaintiff's LTD after two years.

Aetna contends that there are at least two provisions in the plan documents which render its determination reasonable.  First, both the 1998 and 1999 salary protection plans have a section titled "Who is eligible" providing that a participant is "eligible for disability coverage after you have worked for one month as a full-time employee and are regularly scheduled to work at least 30 hours per week. . . .  If you are not actively at work on the day your coverage would normally begin, your coverage will begin on the day after you work five consecutive days." (AR 52, AR 138).  Aetna urges that the elimination of the mental health limitation is a "coverage" within the meaning of this provision, and that plaintiff is not eligible for such coverage because she was not "actively at work" on the day such coverage began in 1999.

Aetna seeks to support this application of the language by relying on a second provision found in a document referred to as a "Summary of Coverage." (AR 215-222). The Summary of Coverage contains the following provision under the heading "Effective Date of Coverage:"

> Your coverage for benefits payable on a monthly basis will take effect on your Eligibility Date.  If you happen to be both disabled and away from work on the date your coverage would take effect, the coverage will not take effect until you return to full-time work for 5 days in a row.  This rule also applies to an increase in your coverage.

AR 216.

Plaintiff contends that Aetna's reliance on the provisions of the plan documents that define "eligibility for coverage" is misplaced, as nothing in the plan states that "a disabled participant would need to newly qualify under an eligibility rule" (Plaintiff's Revised Brief at 12) and that Ms. Powell's "coverage began years earlier" (emphasis

omitted) and the plan says "nothing to suggest that her coverage would need to begin again." *Id.* Insofar as the Summary of Coverage provides more explicit language regarding interim increases in coverage, plaintiff argues that the Summary of Coverage is inconsistent with the plan, was never provided to her, and under applicable case law cannot be applied to deny benefits. *Id.* at 12-14.

At the outset the Court believes it necessary to emphasize the difference between two concepts that are separately discussed in the plan, but which the plaintiff may have conflated in her arguments. One concept is eligibility for disability coverage, discussed in the plans under the section "Who is Eligible" (AR 52, 138).  The other concept is being found disabled, or as the plan describes it, being "considered disabled," which is addressed in the section of the plan entitled "What Is a Disability" (AR 54, 140).  Plaintiff here was determined to be "considered disabled" in July 1998. At that time she was eligible for coverage because she had been working as a full-time employee.  The coverage she received was the "short-term disability" provided for in the policy, that is 26 weeks of salary protection.  *See* AR 52.

Plaintiff was also apparently found to be "considered disabled" by Aetna, according to its letter dated March 3, 1999 when it advised her that she was qualified for monthly benefits, or LTD, because her disability continued for more than 26 weeks. *See* AR 631.  Aetna must have considered plaintiff eligible for disability coverage at that date, or it would not have extended the LTD benefits.

What Aetna apparently found, and which plaintiff contests, is that plaintiff was not eligible for the change in coverage that had become effective January 1, 1999,

namely the elimination of the mental health limitation.  Thus, in its letter of March 3,

1999, when it found plaintiff still to be "disabled," Aetna quoted this limitation to plaintiff.

See AR 632.  The question directly presented here is whether it was reasonable for

Aetna to read the "actively at work" requirement in the plan in a manner that rendered

plaintiff not eligible for the change in coverage that became effective January 1, 1999.

In support of its reading, Aetna cites several decisions, including cases from the

Tenth Circuit, which strictly apply an "actively at work" requirement as it commonly

appears in insurance policies to deny coverage to employees, even though such

application results in a harsh result against the claim of the putative insured.  *See Elsey*

*v. Prudential Ins. Co. of America*, 262 F. 2d 432, 435 (10th Cir. 1958); *Lott v. Hertz*

*Custom Ben. Program,* 1992 WL 73061 at **2-3 (10th Cir., Apr. 9, 1992), *see also,*

*Edwards v. Great West Life Assur. Co.*, 20 F.3d 748, 749 (7th Cir.), *cert. denied* 513

U.S. 962 (1994); *Burnham v. Guardian Life Ins. Co. of America*, 873 F.2d 486 (1st Cir.

1989).  The Court notes, however, that none of these cases involved a situation where

the "actively at work" requirement was applied to deny a claimant the benefit of an

increase in coverage, as is the situation here.

In *Gridley v. Cleveland Pneumatic Company,* 924 F.2d 1310 (3d Cir.), *cert.*

*denied,* 501 U.S. 1232 (1991), a case also cited by defendants, the Third Circuit

implicitly recognized the propriety of applying an "actively at work" provision to deny an

increase in benefits that took effect after the employee ceased active work.  But the

"actively at work" provision at issue in the plan documents at issue in *Gridley* explicitly

specified that the employee became eligible for an increase in benefits only if he was

28

"actively at work on the date an increase in benefits would become effective . . . ."
924 F.2d at 1312.  Thus *Gridley* does not answer the precise question presented here.

On the other hand, plaintiff has cited no case that holds that a provision
conditioning employee eligibility for "coverage" applies only to the initial coverage
and not to an increase in coverage.  Plaintiff's reliance on *Bartlett v. Martin Marietta
Operations Support, Inc., Life Ins. Plan,* 38 F.3d 514 (10th Cir. 1994) (*see* Plaintiff's
Revised Brief at 17-18) is misplaced, for in that case no plan document contained an
"actively at work" requirement at the time the plaintiff's decedent discontinued work due
to his illness.  *See* 38 F.3d at 516 ("The summary plan description, however, was not
printed until after Mr. Bartlett's death . . . .").  Here, however, there is no dispute that the
plan document, or SPD, contained such a requirement at the time plaintiff first went on
short term disability in July 1998.  Thus, the Court finds that neither party has provided
any authority that addresses the precise situation at issue here.

Nonetheless, the Court concludes that, based on the following analysis of the
language in the various plan documents, Aetna's reading of the plan documents to
require plaintiff to be "actively at work" on or after the date a benefit increase was
implemented was reasonable for the following reasons.

First, as the plan states, a plan participant must be "actively at work on the day
your coverage would normally begin." (AR 52).  While the language found in this
section setting forth eligibility for coverage does not expressly refer to eligibility for
"changes" in coverage, it is reasonable to understand that the word "coverage" includes
not only such original coverage as may be afforded to plan participants, but also to any

additions or diminutions from coverage.  Otherwise, there would be little purpose

served by the "actively at work" language, for under plaintiff's argument, once an

employee became eligible for coverage nothing would effect such eligibility, including

not being "actively at work."  Such an interpretation would render the "actively at work"

language nearly meaningless.

Moreover, the Summary of Coverage referenced by Aetna expressly addresses

the question presented, stating that the "actively at work" rule "applies to an increase

in coverage."  (AR at 216).  Plaintiff argues at 13-14 of her Revised Brief that the

Summary of Coverage should carry no weight because it is inconsistent with the

language of the plan, or what she refers to as the SPD.  It is certainly true that where

a summary plan description and a plan document differ, the summary plan description

is binding.  *See Semtner v. Group Health Service of Oklahoma, Inc.,* 129 F.3d 1390,

1393 (10th Cir. 1997).  However, for the summary plan description to be controlling,

there must be an actual conflict between it and the plan documents.  The Court does

not agree that the Summary of Coverage here is inconsistent with the plan.

First, as indicated above, the Court finds that a reasonable understanding of the

"actively at work" provision would include its application to an increase in coverage, as

well as to the initial coverage.  Moreover, at most, the language in the plan, or SPD,

is silent as to whether the "actively at work" requirement applies to an increase in

coverage.  As defendants correctly argue, when a summary plan description is silent

on a specific term or issue, it cannot prevail over the master plan documents.  *See*

*Charter Canyon Treatment Center v. Pool Co.*, 153 F.3d 1132, 1136 (10th Cir. 1998).

30

Thus the Court does not agree that the express provision in the Summary of Coverage is inconsistent with the SPD and must be ignored by the claims administrator.

Plaintiff also argues that the Summary of Coverage should not be considered because it was never presented to plaintiff.  ERISA does not require that every plan document be distributed to participants.  29 U.S.C. § 1022(a) requires that a summary plan description be furnished to participants, and 29 U.S.C. § 1022(b) requires the SPD to describe the "requirements respecting eligibility for participation and benefits." The SPD here does contain the requirements respecting eligibility for coverage, including the "actively at work" requirement.  The statute does not require that every scenario that might arise, or every term of the plan as a whole, be set forth in the SPD. Nor does the statute require that every word used in the SPD be defined in that document, otherwise the SPD would not be a summary at all, and would be as long as the plan documents.  *See Stahl v. Tony's Bldg. Materials*, *Inc.*, 875 F.2d 1404, 1408-09 (9th Cir. 1989) ("to require summary plan descriptions to discuss the application of general rules to a wide range of particular situations and thereby provide specific advice to employees on how to shape their conduct to fit the rules, would undermine the statute . . . .  To require ERISA summary plan descriptions to include accurate and complete information about all of the different factual settings in which a given pension plan rule might apply would lead to the promulgation of 'summaries' many pages in length, perhaps even longer than the plan itself, that would be of no use to the ordinary employee.").

Furthermore, even if the plaintiff is correct that the "actively at work" language constitutes a discrepancy between the SPD and the plan documents, plaintiff must show some significant reliance upon, or possible prejudice flowing from, the alleged faulty plan description. *See Nance v. Sun Life Assur. Co. of Canada,* 294 F.3d 1263, 1272 (10th Cir. 2002).  Plaintiff has not shown, or even alleged, that she relied on the "actively at work" language contained in the SPD to her detriment.

Plaintiff does suggest that she received the 1999 amendments to the plan "in late 1998" and that she was told to insert the new pages into her copy of the benefits handbook, effectively deleting the mental health limitation.  *See* Plaintiff's Revised Statement of Facts at ¶ P-17.  However, plaintiff does not allege or demonstrate that she detrimentally relied on the handbook as revised.  In fact, the administrative record reflects that plaintiff did not assume that the mental health limitation had been deleted.  She was expressly told in Aetna's letter of March 3, 1999 that the mental health limitation still applied to her case and would result in benefits termination in 24 months unless she was confined in a health facility (AR 632). Thereafter, plaintiff continued to submit medical information to Aetna relating to her disability, *see* AR 643-48, because she hoped the medical notes would extend her disability certification. *see* AR 643.  This does not suggest that plaintiff detrimentally believed that the mental health limitation had been eliminated and therefore "sat on her rights" in reliance on such a belief.

The Court also rejects plaintiff's suggestion that Aetna's application of the mental health limitation constituted some type of devious effort by Aetna to devise a

reason to "cut-off" plaintiff's LTD benefits after January 2001 by "resurrect[ing]" a deleted provision. *See* Plaintiff's Revised Brief at 6-7. As noted, in Aetna's initial letter advising plaintiff that she would receive LTD benefits she was advised of the mental health limitation (AR 632). In each follow-up letter plaintiff was again so advised. *See* AR 662, 727, 773. Any suggestion that the mental health limitation was belatedly raised during the administrative review is unsupported by the record.[6] Accordingly, a reasonable application of the above-quoted provisions found in the plan documents could conclude that the elimination of the mental health limitation effective January 1, 1999, was not applicable to plaintiff until such time as she returned to work.

There is no dispute that plaintiff was still an "employee" of Quest as of January 1, 1999 in the sense that she remained on the employee roster. But it appears undisputed that she was not "actively at work." Nor is there any suggestion that plaintiff ever physically returned to work after January 1, 1999. Thus Aetna's determination in

---

[6] The Court notes that the language of the underlying insurance policy relating to Aetna's provision of benefits after the five year period also includes an "actively working" requirement. The policy provides:

> Addition or Deletion of a Benefit  Except as set forth in the next paragraph, if any benefit becomes applicable to an employee or dependent who is already covered under the policy, that person will be eligible for the benefit right away. Coverage will be effective in line with the Effective Date provisions. This includes the Active Service Rule and any Non-Confinement Rule.

AR 276. The Active Work Rule is set forth on the following page of the policy:

> If the employee is both disabled (that is: ill or injured) and away from work on the date any of his Employee Coverage (or any increase in such coverage) would become effective, the effective date of the coverage (or increase) will be held up until the date he goes back to work for one full day.

AR 277.

January 2001 to apply the mental health limitation to plaintiff as a provision of the plan was reasonable, assuming plaintiff was disabled as a result of a mental condition.

The precise language of the mental health limitation provision states that a long term disability "caused to any extent by a mental condition" will be limited to 24 months of benefits (AR 55). The Court finds that Aetna could reasonably find that plaintiff's LTD was caused to some extent by her mental illness.

Although at the time plaintiff's disability commenced there is no document stating the precise medical basis for finding plaintiff disabled, there is ample medical evidence that her disability emanated to some extent from a mental condition.

Plaintiff's initial absence from work was caused when she was hospitalized at the North Colorado Medical Center in Greeley, Colorado as a result of a recurrence of major depression and report of a suicide plan (AR 624). In support of her disability claim plaintiff submitted psychiatric assessments from Drs. James Medelman and Huff. (AR 627, 628). On December 23, 1999, plaintiff submitted a note from Dr. McCall dated November 11, 1999, stating that "The above pt. [patient] is totally disabled d/t [due to] emotional fragility, chronic depression, & total knee replacement 9-27-99. Will be disabled for min. of 6 mo." (AR 647). By letter dated November 28, 2000, Dr. McCall provided another medical assessment to Aetna, in which she stated that plaintiff "has had multiple, chronic, disabling medical problems as well as a significant depression resistant to any medical treatment." (AR 661). Dr. McCall's notes of plaintiff's office visits on December 13, 2000 and January 17, 2001 reflect diagnoses of "chronic depression." (AR 670). Based on this medical evidence, the Court cannot

34

say it was unreasonable for Aetna to find in January 2001, at the time it terminated

plaintiff's benefits under the mental health limitation, that plaintiff's disability was to

some extent caused by a mental condition.

This may seem like a harsh result to the plaintiff, but it is mandated by the

contract language.  It is not within the power of this Court in an ERISA context to reform

the disability insurance contract, but only to determine whether its provisions, as

contracted to by the parties, have reasonably been applied.  The determination made

to terminate plaintiff's benefits in January 2001 by applying the mental health limitation

cannot be said to be unreasonable.

   2.   <u>Whether Aetna's determination that plaintiff was not otherwise disabled
        "absent her depression" was arbitrary and capricious</u>.

Plaintiff also contends that even if Aetna properly considered plaintiff subject to

the mental health limitation provision, it still should have found her disabled sometime

after January 2001 apart from her depression and continue her LTD due to other

physical conditions.  Plaintiff's contends that Aetna's decision in this regard was

arbitrary and capricious.  The Court does not agree.

The Court has detailed above the numerous steps taken by Aetna to review

plaintiff's claim of disability after January 2001, including the referrals for functional

capacity evaluations, the performance of a transferable skills analysis, and the

performance of a labor market survey to identify occupations plaintiff could perform,

and those need not be repeated here.  In addition, plaintiff's files were reviewed by at

least three medical examiners who concluded uniformly that plaintiff's disability was

due, in large part, to her depressive disorder, but that she could perform sedentary work.  Aetna certainly did not arbitrarily and capriciously deny plaintiff's request for benefits without giving her due consideration.

Plaintiff argues that Aetna acted arbitrarily because it did not refer plaintiff to an outside, independent doctor for evaluation (Plaintiff's Revised Brief at 23-25).  While there is apparently no dispositive case law in the Tenth Circuit, the several cases cited by defendants hold that independent medical examinations are not mandated under ERISA to render a claims administrator's decision reasonable. *See* Defendant's Reply Brief at 26-28.  Plaintiff apparently concedes in her reply brief that independent medical examinations are not mandated (Plaintiff's Reply filed December 9, 2004, at 31).

More significantly, the Court finds that the administrative record reflects that plaintiff's own doctors continued to ascribe her condition as relating, at least to "some extent," to mental, psychological or emotional problems.  In handwritten notes from a visit of January 26, 2000, Dr. Huff noted that plaintiff was suffering from "depression-chronic pain" and he prescribed Wellbutrin, an antidepressant (AR 842).  In handwritten notes from a visit of March 23, 2000, Dr. Huff again noted that plaintiff was suffering from "depression-chronic pain" and that she had a "down month, feeling sad." (AR 843).  In handwritten notes from a visit of April 20, 2000, Dr. Huff noted that plaintiff was "less depressed" but still had a "majority of down days," noting a diagnosis of depression (AR 844).  His notes of May 11, 2000, June 13, 2000 and July 12, 2000 all note plaintiff is suffering from depression (AR 845-46).

In a note of February 7, 2001, Dr. Huff comments that plaintiff is depressed due to chronic illness (AR 852).  In a letter dated April 17, 2002, Dr. McCall wrote that plaintiff has chronic, disabling medical problems "as well as significant depression resistant to any medical treatment." (AR 869).  In a letter dated September 22, 2002, Dr. Huff wrote that secondary to plaintiff's dramatic medical illnesses, "she has developed a severe depression with anxiety that is incapacitating."  (AR 872).

Plaintiff argues repeatedly that because some of her doctors suggest that plaintiff's depression was "secondary" to depression, this finding should take plaintiff's case out of the mental health limitation language.  However, the argument ignores that fact that the limitation is applicable when the disability is caused "to any extent" by a mental health condition.  Courts have held that even when the mental health condition is "secondary" to a physical condition, the "caused to any extent" mental health limitation may be applied.  *See e.g. Bergquist v. Aetna U.S. Healthcare*, 289 F. Supp. 2d 400, 412 (S.D.N.Y. 2003) ("the record contains substantial evidence tending to show that plaintiff's disability was caused, at least in part, by a mental condition, which disentitles her to benefits beyond the 24 months already paid out to her. . . . By determining that plaintiff's mental condition, at the very least contributed to her condition, Aetna appears to have followed the letter of the policy in denying her further disability benefits. ").  Dr. Huff's letter of September 22, 2002, on which plaintiff relies, to the extent it opines that plaintiff is disabled expressly states "she has developed a severe depression with anxiety that is incapacitating." (AR 831).  According to Dr, Huff, the plaintiff's capacity to work is to some extent caused by her severe depression.

Given the medical information provided to Aetna by plaintiff, her counsel and her own doctors, as well as the evaluators to whom plaintiff was referred, including the outside functional capacity evaluators, this Court cannot find that Aetna's final determination of December 4, 2002 was not reasonable.  *See* AR 882-84.  Aetna's conclusion plaintiff's that disability was "to any extent" related to a mental condition, for which she had already received the maximum two years of benefits, and that she could nonetheless work at some sedentary occupation, was a reasonable determination supported by substantial medical evidence, and was not reached in an arbitrary and capricious fashion.

**PLAINTIFF'S PENALTY CLAIM**

Plaintiff's second claim for relief, denominated "Penalties Under 29 U.S.C. § 1132(c)," requests the Court to assess a penalty against defendants of $100 per day for each day of delay in responding to plaintiff's request for documents.  The claim does not specify which requested documents were not timely produced.  Defendants assert that plaintiff's claim should be denied for various reasons.

First, defendants assert a claim under 29 U.S.C. § 1132(c) can be brought only against the plan administrator and not against the claims administrator, plan insurer or the plan itself.  The Court agrees.  Under the decision in *McKinsey v. Sentry Ins.*, 986 F.2d 401, 405 (10th Cir. 1993), any liability for failing to provide requested information falls solely upon the designated plan administrator.  Accordingly, Defendant Aetna, the claims administrator and plan insurer, and Defendant Quest, the plan itself, cannot be subject to liability under 29 U.S.C. § 1132(c), and the only proper party to such a claim

38

is Defendant Administration Committee, which is the plan administrator.  Plaintiff her-

self seemed to recognize this fact by filing the Amended Complaint that adds the

Administration Committee as a defendant.  Accordingly, plaintiff's claim under

29 U.S.C. § 1132(c) must be dismissed against Defendants Aetna and Quest.

Defendants next contend that plaintiff's claims against the Committee are time

barred by the Colorado one-year statute of limitations, applicable to claims such as

those asserted here by plaintiff.  In *Adams v. Cyprus Amax Mineral Co.*, 44 F. Supp. 2d

1126, 1140 (D. Colo. 1997, Kane, J.), *rev'd. on other grounds*, 149 F.3d 1156 (10th Cir.

1998) and in *Damon v. Unisys Corp.*,  841 F. Supp. 1094, 1097 (D. Colo. 1994,

Babcock, J.), judges of this district expressly held that C.R.S. §13-80-103(1)(d),

Colorado's one-year statute of limitations applicable to penalty claims, applies to claims

brought under 29 U.S.C. § 1132(c).

Plaintiff does not seriously dispute that she filed her case more than one year

after the request for documentation had been sent.  Rather, she argues that this Court

should not follow the above Colorado cases, but instead apply "federal law" to

determine the applicable time for filing such a claim (Plaintiff's Revised Brief at 29-32).

Plaintiff argues, in part, that the Colorado statute should not be applied as these

claims under 29 U.S.C. § 1132(c) are not "expressed as penalties" and "should not be

viewed as penalties."  Plaintiff's own Amended Complaint contradicts this assertion.

Plaintiff herself captioned her claim as one requesting "Penalties Under 29 U.S.C.

§ 1132(c)."  This Court is not inclined to disagree with the well-reasoned and

established precedent in this district.  The plaintiff's claim for penalties under 29 U.S.C.

§ 1132(c) is subject to Colorado's one-year statute of limitations.

Here, plaintiff filed her initial complaint on December 19, 2003.  All of plaintiff's

requests for documents were made prior to December 19, 2002, or more than one year

before she filed her complaint.[7]  Accordingly, plaintiff's claims under 29 U.S.C.

§ 1132(c) are barred by the applicable statute of limitations and must be dismissed.

**CONCLUSION**

Defendants' Motion for Summary Judgment (Dkt. # 43) is GRANTED.

Plaintiff's Motion for Judgment (Dkt. # 68) is DENIED.

Plaintiff's Amended Complaint is dismissed with prejudice.  The Clerk of the

Court is directed to enter judgment for defendants and to administratively close this

case.

DATED: September 29, 2005

BY THE COURT:

s/ Phillip S. Figa

_____

Phillip S. Figa
United States District Judge

---

[7] The letter from plaintiff's counsel dated January 3, 2003 (AR 1457-60), which appears
to be the final communication with the defendants prior to the filing of the complaint, does not
request documents.